# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 54409-1-II |
| Respondent, | |
| v. | |
| DAMIAN BRADLEY BELANDER, | UNPUBLISHED OPINION |
| Appellant. | |

VELJACIC, J. — Damian B. Belander appeals his conviction and sentence for two counts of murder in the first degree (counts I and II) and one count of arson in the second degree (count V). First, Belander argues that the trial court erred by admitting the recording of his custodial interview because it violated certain provisions of Washington's Privacy Act (WPA), chapter 9.73 RCW. Second, he appears to argue that the State improperly commented on his right to silence when it introduced the custodial interview at trial. Third, he argues that the prosecutor committed misconduct by commenting on his right to silence and by impugning defense counsel's integrity in closing argument. Fourth, he argues that the State failed to present sufficient evidence to prove that the victim's death occurred in the course of, in furtherance of, or in immediate flight from arson in the second degree to support his conviction for murder in the first degree, as charged in count II. Fifth, he argues that the trial court violated his right to be free from double jeopardy because it failed to vacate one of his convictions for murder in the first degree as both were based on the same offense. Sixth, he contends that trial counsel provided ineffective assistance based on their failure to object to the admission of the custodial interview and certain statements contained

therein. Finally, he contends that the trial court erred by imposing community custody supervision fees after finding him indigent.

We decline to address Belander's WPA claim and right to silence claim under RAP 2.5(a) because he raises these issues for the first time on appeal. We hold that the prosecutor did not commit reversible misconduct and that Belander was not provided ineffective assistance of counsel. However, we hold that the State did not present sufficient evidence to prove that the victim died in the course of, in furtherance of, or in immediate flight from arson in the second degree to support Belander's conviction for murder in the first degree, as charged in count II. Therefore, we do not address Belander's double jeopardy claim. Accordingly, we affirm Belander's conviction for murder in the first degree, as charged in count I, and for arson in the second degree, as charged in count V. However, we reverse Belander's conviction for murder in the first degree, as charged in count II, and remand for the trial court to dismiss count II with prejudice. We also remand for the trial court to reconsider the imposition of community custody supervision fees.

FACTS

I.    FACTUAL BACKGROUND

A.    Discovery of the Burnt Van and Brian Bodle's Body

On January 24, 2019, Mitchell Gundy-Hampton was near the Ape Caves area on Forest Road 83 "enjoying the mountains" with his dogs. 1 Report of Proceedings (RP) at 461. On his way up to the mountains, he noticed a "burnt up" van on the side of the road. 1 RP at 462. On his way back down, Gundy slowed down to get a better look. He noticed something in the brush. He got out of his vehicle and discovered a person laying on the ground.

Shortly thereafter, at approximately 2:00 p.m., Gundy managed to flag down a couple hiking in the area. Gundy used their cell phone to contact the police to report the body. The body was later identified as Brian Bodle.

B.      The Events Leading up to Bodle's Death and the Events Thereafter

Bodle was a known heroin user and dealer. On January 22, 2019, Bodle contacted Breanna Teafatiller and asked to borrow $200, which he planned to use to purchase heroin in Portland, Oregon. Bodle borrowed a truck from a business associate, Jason Stacey, in exchange for some heroin.

At about 10:00 p.m. on January 22, 2019, Bodle arrived at Teafatiller's apartment in Mount Angel, Oregon. After Teafatiller gave Bodle the money, Bodle stated that he needed to go to a gas station. Bodle was not familiar with the area, so he asked Teafatiller to accompany him and provide directions. Teafatiller agreed and got in the truck. When they arrived, the gas station was closed. Bodle drove back to the apartment, but ran a stop sign in the process.

At about 10:50 p.m., Cody Best, a police officer for the City of Mount Angel, observed Bodle running the stop sign and initiated a traffic stop. Officer Best issued Bodle multiple citations for driving an uninsured vehicle, driving with a suspended license, and for failing to obey a traffic control device. Officer Best impounded the truck based on the multiple traffic violations.

Bodle now needed a ride to Portland. Teafatiller contacted Belander via Facebook messenger to help Bodle. Belander told Bodle to call him, and the two began communicating. Bodle then sent Belander a friend request on Facebook, which Belander accepted. Bodle agreed to pay Belander to drive him to Portland.

In January 2019, Belander drove a red or maroon 2002 Chrysler Voyager, which was owned by his mother's then-boyfriend, Joshua Lewis. The vehicle had an issue with overheating, and Lewis stated that it was "pretty common to have jugs of water in the car." 2 RP at 589.

Teafatiller stated that Belander arrived at her apartment in a "red minivan" when he came to pick up Bodle. 2 RP at 632. Teafatiller also stated that Belander asked her to fill up water jugs for the van because it was having an overheating problem.

Belander and Bodle left Teafatiller's apartment at about 3:00 a.m. on January 23. At 5:23 a.m., Stephen Jaeger, one of Bodle's customers, received a message from Bodle stating that he was on his way back to McMinnville, Oregon. That was the last time Jaeger heard from Bodle, but he continued to reach out to him to purchase heroin. Shortly thereafter, at approximately 6:00 a.m., Teafatiller received a message from Bodle stating, "I up," which she took to mean as "you up." 2 RP at 635. Teafatiller attempted to contact Bodle when she woke up, but he never responded.

At 6:08 a.m., Belander's phone pinged[1] off a cell tower in Troutdale, Oregon. At about 6:30 a.m., Belander's phone pinged off a cell tower in Gresham, Oregon. Belander's phone records indicated no outgoing activity from about 6:30 a.m. to 3:30 p.m. Then, at about 3:30 p.m., Belander's phone pinged off a cell tower in Washougal, Washington. Belander either checked his voice mail or initiated a call 23 times from 3:32 p.m. to 7:05 p.m.

---

[1] The United States Supreme Court has explained that, "[c]ell phones continuously scan their environment looking for the best signal, which generally comes from the closest cell site. . . . Each time the phone connects to a cell site, it generates a time-stamped record known as cell-site location information." *Carpenter v. United States*, __U.S. __, 138 S. Ct. 2206, 2211, 201 L. Ed. 2d 507 (2018). "Pinging" is simply the process of sending a signal to identify the location of a cell phone. *State v. Muhammad*, 194 Wn.2d 577, 582 n.1, 451 P.3d 1060 (2019).

Frustrated that Bodle would not respond and worried about not being repaid, Teafatiller called Belander at 3:43 p.m. on January 23. Belander did not answer. Teafatiller messaged Belander demanding that he call her, to which Belander responded "why?" 2 RP at 642. Belander told Teafatiller that Bodle had stolen his van and that he was angry. Belander claimed that Bodle stole the van at a gas station, but refused to give details about how or where that happened.

Teafatiller told Belander that he should file a report concerning the stolen van, but Belander refused. Belander claimed that there could be a firearm in the van and indicated that, as a felon, he was not allowed to possess firearms. Later on, Teafatiller offered to report the stolen van for Belander and asked for a description of the vehicle. Belander told Teafatiller that she was "trippin" and blocked her from messaging him. 2 RP at 647. At 4:29 p.m. on January 23, Belander removed Bodle as a Facebook friend.

From 7:05 p.m. to 11:13 p.m., on January 23, Belander's phone records show that he received seven phone calls that went straight to voice mail and four text messages. Belander's phone never pinged off a cell tower during that period of time.

At 8:56 p.m. on January 23, a red van matching the description of Lewis's 2002 Chrysler Voyager was captured travelling eastbound on Lewis River Road in Woodland, Washington on an ampm video camera. Then, at 9:42 p.m., a video camera on the Swift Dam captured the same vehicle and a dark sedan driving eastbound. At 10:04 p.m., the same sedan was captured heading westbound back toward Woodland on the Swift Dam video cameras.

Jeremy Schultz, a detective for the Skamania County Sheriff's office, stated that coming from the west side, the most common and direct route to where the burnt van was found would be through Woodland on Lewis River Road. From this route, one cannot reach the location of the burnt van without passing the Swift Dam. Detective Schultz also stated that it would take

approximately 47 minutes to get from the ampm in Woodland to where the Swift Dam cameras were. Schultz stated that it would take approximately eight minutes to get where the burnt van was located on Forest Road 83 from the Swift Dam cameras.

At 11:13 p.m. on January 23, Belander's phone pinged off of a cell tower in northern Vancouver, Washington. Detective Schultz testified that the timing of Belander's phone records and surveillance footage was consistent with how long it would take to travel to and from Forest Road 83 from the northern Vancouver area.

At about 11:33 p.m. on January 23, Belander contacted Felicity Torres, his ex-girlfriend, via Facebook messenger. Belander told Torres that "[he's] been going crazy . . . being wild." 3 RP at 1078. He also told her that he was angry at everything, he was losing himself, and that he was in Portland and needed help. Belander told Torres that some of his belongings were stolen, and asked her for clothes and shoes. Torres asked what had happened. Belander responded, "I'm not gonna explain it over the phone." 3 RP at 1080. The two shared a brief phone conversation and Belander asked Torres to contact his mom to report the van as stolen. Torres stated that she knew the van was "either a Town and Country, or a Chrysler." 3 RP at 1081. But, a couple of days later, when Torres asked for further clarification about the make and model of the van, Belander told her that it was a Honda. Belander also did not give specific details about what happened, who stole the van, or where it was stolen.

Belander contacted Amber Greenfield on January 23, about being stranded in Washington. The next day, Greenfield asked Belander about the stolen van, but he did not respond. Greenfield asked Belander to call her and that she would give him "a ride no matter what." 3 RP at 1284. Then, on January 27, Belander told Greenfield that "[he was] f***ed up in the head" and that "[he]

need[ed] to leave [the] state." 3 RP at 1288. Greenfield responded, "now?" 3 RP at 1288. And Belander replied, "[l]ike I'm f***ed." 3 RP at 1288.

On January 24, Belander contacted Lydia Layton on Facebook messenger asking for help. Belander told her that his clothes were "wet and bloody." 3 RP at 1061. The next day, Belander asked for fresh clothes and Nikes. He also offered to sell heroin to Layton. Belander also messaged another Facebook friend on January 25, asking for fresh clothes and Nikes.

Belander messaged his friend Melanie Tobaner at about 3:00 a.m. on January 24. Belander asked if they used heroin, to which Tobaner responded in the affirmative. Belander asked if they needed some and said that he needed a ride back to McMinnville because he had "gotten [him]self into a situation, where [he] had to leave [his] car, and almost everything [he] owned." 3 RP at 1302. Belander also indicated that he needed fresh clothes and shoes.

Belander messaged his friend Cesar Ornelas-Ortiz on January 24. Belander told Ornelas-Ortiz, "I need your help, it's an emergency." 3 RP at 1305. Ornelas-Ortiz asked Belander, "what the f**k is going on, what's going bad?" 3 RP at 1305. Belander responded, "I might be in prison the rest of my life." 3 RP at 1305. Belander stated that he did not have a vehicle and could not be seen. He also stated that "no one must know that I'm talking to you right now." 3 RP at 1306. Belander messaged another friend stating, "I've ruined my life completely and it's all my fault." 3 RP at 1306.

Belander informed at least 10 people that he had heroin for sale in the late hours of January 23. However, Belander was not primarily known as a heroin dealer. And prior to that time frame, Belander had not messaged anybody about heroin.

7

C.     The Cause of the Vehicle Fire and Forensic Testing of Items Found at the Crime Scene

Joshua Barnes, the deputy fire marshal for the Clark County Fire Marshal's office, was assigned to investigate the cause of the vehicle fire. Based on his training and experience, Barnes stated that the "2002 Chrysler Voyager was intentionally set on fire." 2 RP at 557. Specifically, Barnes stated that the "origin of the fire [was] the interior of the vehicle, and the cause [was] handheld flame." 2 RP at 558. Barnes further noted that the flame began in the driver's side of the vehicle while the back hatch was open, which helped fuel the fire.

Bodle's body was found in a wooded area close to the burnt up van. The investigation revealed that there was some disturbance in the surrounding vegetation and that there were drag trails from the rear of the van to Bodle's final resting place. Detective Schultz stated that, based on the damaged vegetation, drag trails, and state of Bodle's clothing, he believed that Bodle was intentionally placed in the wooded area.

Several other items were found lying on the ground near the van and Bodle's body. These items included a black shoe, pink towel, a shirt, a black Harley Davidson sweatshirt, a stocking cap, and a Coors Light beer can. A tire iron was also discovered amongst the burnt debris.

Heather Pyles, a forensic DNA analyst with the Washington State Patrol Crime Laboratory, processed the items discovered at the crime scene. Pyles stated that there was "very strong support" for the inclusion of Belander's DNA on the stocking cap found near Bodle's body. 2 RP at 919. Bodle's DNA was excluded as a contributor to the stocking cap. Pyles also processed the jacket that Bodle was wearing at the time of his death. Pyles stated that law enforcement sent a photograph which showed that the left shoulder of the jacket was bunched up and had a tear or rip in the bottom left arm seam. Pyles also stated that there was "very strong support" for the inclusion

of Belander's DNA on the left shoulder of Bodle's jacket. 2 RP at 934. Pyles did not test the tire iron for DNA because it was subject to fire damage which would not leave detectable traces of DNA.

### D. The Cause of Bodle's Death

Dr. Megan Quinn, a forensic pathologist for the Clark County Medical Examiner's office, performed the autopsy on Bodle's body. Dr. Quinn determined that the cause of death was "[b]lunt force injury to the head." 3 RP at 1132. During her examination, Dr. Quinn noticed that there were small fragments of brain matter and blood inside of the hood of Bodle's jacket. She also noticed that most of the blood that soaked the jacket was in the hood and upper back area. Dr. Quinn described Bodle's head injury as a "zigzag laceration, to the vertex of the scalp," which is indicative of blunt force injury. 3 RP at 1146.

Dr. Quinn stated that she was confident that "there had been more than one blunt force impact" to cause Bodle's death. 3 RP at 1153. Specifically, based on the zigzag laceration and two other discrete wounds, Dr. Quinn stated that "there had been at least three blunt force impacts to the head, if not more." 3 RP at 1154. Dr. Quinn stated that Bodle likely did not die immediately from the blunt force injuries, but likely remained unconscious for a few minutes to an hour until he bled out. Dr. Quinn further stated that Bodle's injuries were consistent with being hit on the head with a tire iron or any rod-like structure with a little ball on the end.

Bodle had amphetamines and opiates in his system and a blood alcohol concentration of .117 at the time of his death.

### E. Charging Information

On January 31, 2019, Belander was arrested in Yamhill County, Oregon on an unrelated matter. By fourth amended information, the State charged Belander with one count of murder in

9

the first degree (premediated) (count I), one count of murder in the first degree in the course of another crime (arson in the second degree) (count II), one count of murder in the second degree (intentional murder) (count III), one count of murder in the second degree in the course of a felony (assault in the second degree) (count IV), and one count of arson in the second degree (count V). The State also alleged that Belander committed counts I-IV while armed with a deadly weapon other than a firearm. Belander pleaded not guilty and the case proceeded to a jury trial.

II.     THE TRIAL

A.      CrR 3.5 Hearing and Admission of the Custodial Interview During Trial

Detectives Monty Buettner and Schultz travelled to the Yamhill County Sheriff's office to get a statement from Belander following his arrest on an unrelated matter. The detectives conducted an hour long recorded interview that occurred in two parts. The first half of the recording begins with Detective Buettner stating, "[a]ll right, the recorder's on and we're detectives with the Skamania County Sheriff's Office. Because you're here, do you know, what are you arrested for?" 1 RP at 50. Detective Buettner also read Belander his *Miranda*[2] warnings in the first recording. Belander answered in the affirmative when asked if he understood his rights. The second recording does not mention the recording device or *Miranda* warnings.

The second half of the recording began with Detective Buettner stating, "[e]xcuse me, [Belander], Josh, you said, was your mom's boyfriend, right?" 1 RP at 55. The second half concluded with Belander asserting his right to remain silent and right to counsel:

> [Belander:] I'm not answering hard questions, so.
> [Detective Buettner:] Okay, that one a hard one?
> [Belander:] No, it's not a hard one. *It's just like, I'm tired of dealing with all this bullsh\*t, so like, if you want to talk to me, you can talk to a lawyer.*
> . . . .
> [Belander:] So, like I said, if you guys are done, I'm done.

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

10

[Detective Buettner:]  If we're done?

[Belander:]  Yeah, if you're done asking questions.

[Detective Buettner:]  Okay.  All right, that's fair.

[Detective Buettner:]  I'm not done asking questions.

[Belander:]  Okay, well, I'm done answering questions.

[Detective Buettner:]  Oh, okay, I just needed that clarification then, because I thought you were telling me that, if I'm done asking questions, then we can go, but if I'm not done, then we can stay.  That's not what you're saying?

[Belander:]  What I'm saying is, I don't know anything, what you guys are talking about, and I've never been these places, that you say that I've been, and so, like, and you guys aren't gonna believe me either way, so I'm done answering questions.

1 RP at 57-59 (emphasis added).  Neither recording began with nor ended with an indication of the time.

The trial court held a CrR 3.5 hearing to determine the admissibility of the custodial interview.  The court concluded that "any statements after the indication of, if you want to talk to me, you can talk to a lawyer, is an unequivocal request, to invoke his rights to remain silent at that point in time, and anything, after that point in time, will be inadmissible, at the time of trial."  1 RP at 81.

At trial, the State played the two-part custodial interview for the jury, which Belander did not object to.  The recording concluded with the following exchange:

[Belander:]  Look, I'm not answering hard questions, so.

[Detective Buettner:]  Okay, that one a hard one?

[Belander:]  No, it's not a hard one.  *It's just like I'm tired of dealing with all this bullsh\*t.*

(Recording ends)

RP (Jan. 30, 2020) at 39 (emphasis added).  During the direct examination of Detective Schultz, the State did not follow up on Belander's comment at the conclusion of the recording.  Instead, the State questioned Detective Schultz on Belander's whereabouts based on his cell phone records and camera footage.

B.      Closing Arguments

During closing, the prosecutor stated that defense counsel's alternative theories of the case were ridiculous based on the totality of the evidence. Specifically, during rebuttal, the prosecutor stated that

> [n]o other alternative makes sense, with the evidence. [Defense counsel] gave you an alternative theory[] that is ridiculous. It doesn't make any sense at all. That theory is sure fanciful speculation, and that's all it is, right; because in order to believe it, you've got to believe that, [] Belander wasn't lying about the van, and yet, he, clearly, was lying about the van. There's no other explanation for it. He didn't even tell a consistent story, to his friends, and then, when he had the chance to talk to law enforcement, [defense counsel] will make a big deal, about how they didn't tell him, why he was there; he knew why they were there. Look at the Facebook messages; he knew, exactly, what was going on; he was concerned, about the van being reported stolen; he knew, exactly, what was going on. All of that, is just smoke and mirrors, and [defense counsel], trying to confuse you, right, because in his own words, he thinks he'll beat it, which, that's not, I didn't do it.

3 RP at 1472-73.

The prosecutor also commented on defense counsel's attempt to draw a reasonable doubt based on the State's method of DNA testing. The prosecutor explained to the jury why the State did not test all surface areas of the collected evidence or why it omitted testing other items. The prosecutor then urged the jury to reject defense counsel's arguments:

> Now, [defense counsel] says, we didn't test anything, that we didn't think would have [] Belander's DNA on it, which is ridiculous.
>         . . . .
> It'd be ridiculous, to try to test those things; and [defense counsel] knows it; and [] Belander knows it; and what they're saying is, look over here; don't look at the actual evidence. Imagine, imagine a story that, where it's possible, that [] Belander didn't do this. That's what they're asking you to do; that's the ridiculous, alternative theory; imagine a story, where [] Belander couldn't do this; but that's not what reasonable doubt is; that is unreasonable doubt; that is pure speculation; and the state is not required, because we never could disprove, every ridiculous possible theory, about what might have happened. There's no evidence, for any of that, zero evidence. The only evidence, that anybody stole [] Belander's van, is the inconsistent stories, [] Belander told, that were obviously meant to fool, even, his

12

own friends; to get sympathy; to find ways to push people, away from the idea, that he'd done this, or was planning to do this; and it was clear, that he was planning to do it. The interview speaks for itself; you all heard it; the investigators did not try to fool [] Belander. They, merely, asked him open-ended questions; asked him, whether he knew people, that they already knew he knew; and he lied about it; so yeah, they asked him a couple of things, that weren't literally true; but they knew []Teafatiller had said, they were together, at that apartment complex; and he wouldn't, even, admit he was in an apartment complex in Mount Angel; he wouldn't, even, admit that he knew [] Teafatiller; so whatever else happened, in that interview, it doesn't undermine, what you learn from it; which is, that [] Belander was trying to hide his responsibility, for what he did. That's all you learned, from that interview that he is a liar; and he was trying to hide his responsibility for this crime.

. . . .

[Defense counsel] and [] Belander are just trying to mislead you on that; look, closely, at the evidence; it speaks for itself.

3 RP at 1473-76. Defense counsel did not object to these statements.

## III. JUDGMENT AND SENTENCE

The jury found Belander guilty as charged. The jury also found that Belander was armed with a deadly weapon during the commission of counts I-IV.

At sentencing, the trial court vacated counts III and IV (both for murder in the second degree). The court imposed a standard range sentence of 385 months' confinement.

The trial court found Belander indigent. With no discussion on the record, the court required Belander to pay Department of Corrections (DOC) supervision fees in his judgment and sentence. Belander appeals.

## ANALYSIS

## I. WASHINGTON'S PRIVACY ACT

Belander argues that the trial court erred in admitting the custodial interview following his arrest in Yamhill County because those recordings violated the WPA, chapter 9.73 RCW. The

13

State argues that we should decline to address the issue under RAP 2.5(a) because Belander raises the issue for the first time on appeal. We agree with the State.

"In light of its strong wording, the [WPA] must be interpreted to effectuate the [legislature's] intent." *State v. Christensen*, 153 Wn.2d 186, 200, 102 P.3d 789 (2004). We review alleged violations of the WPA de novo. *State v. Racus*, 7 Wn. App. 2d 287, 297, 433 P.3d 830 (2019).

The WPA prohibits the recording of private conversations without consent of all parties. RCW 9.73.030(1)(b). However, an exception is carved out for law enforcement officers and other emergency response personnel under certain circumstances. RCW 9.73.090(1). Relevant here, the statute expressly authorizes the police to record custodial statements so long as the recording "conform[s] strictly" to the following:

> (i) The arrested person shall be informed that such recording is being made and the statement so informing him or her shall be included in the recording;
> (ii) The recording shall commence with an indication of the time of the beginning thereof and terminate with an indication of the time thereof;
> (iii) At the commencement of the recording the arrested person shall be fully informed of his or her constitutional rights, and such statements informing him or her shall be included in the recording;
> (iv) The recordings shall only be used for valid police or court activities.

RCW 9.73.090(1)(b).

Under RAP 2.5(a), we may refuse to review any claim of error which was not raised in the trial court. A party may raise only three types of claimed errors for the first time on appeal: "(1) lack of trial court jurisdiction, (2) failure to establish facts upon which relief can be granted, and (3) manifest error affecting a constitutional right." RAP 2.5(a).

14

Here, Belander argues that the State failed to strictly comply with RCW 9.73.090(1)(b) because the first recording did not begin or end with an indication of the time. Belander also contends that the second recording did not include a statement informing him that the interview would be recorded, did not begin or end with an indication of the time, and did not include a statement informing him of his constitutional rights.

Belander raises his WPA claims for the first time on appeal and does not demonstrate to us any basis for review under RAP 2.5(a). Rather, he contends that, because RAP 2.5(a) is written in discretionary terms, we should address his WPA claims.

Here, the only basis for review would be RAP 2.5(a)(3). The "[a]pplication of RAP 2.5(a)(3) depends on the answers to two questions: '(1) Has the party claiming error shown the error is truly of a constitutional magnitude, and if so, (2) has the party demonstrated that the error is manifest?'" *State v. Grott*, 195 Wn.2d 256, 267, 458 P.3d 750 (2020) (quoting *State v. Kalebaugh*, 183 Wn.2d 578, 583, 355 P.3d 253 (2015)). However, the "[a]dmission of evidence in violation of the [WPA] is a statutory, and not a constitutional violation." *State v. Courtney*, 137 Wn. App. 376, 383, 153 P.3d 238 (2007). Accordingly, we decline to address Belander's WPA challenge raised for the first time on appeal.

## II. CONSTITUTIONAL RIGHT TO REMAIN SILENT

Belander argues that the State violated his right to due process and privilege against self-incrimination because it introduced the portion of the custodial interview where he asserted his right to counsel and his right to remain silent. Specifically, Belander appears to contend that the State's introduction of the custodial interview amounted to an impermissible comment on his right

to remain silent.[3] Because Belander raises this issue for the first time on appeal and fails to demonstrate manifest error, we decline to reach the issue.

### A. Legal Principles

Generally, a party may not raise an issue for the first time on appeal. RAP 2.5(a). However, RAP 2.5(a)(3) allows a party to raise an issue for the first time on appeal where the issue involves a "manifest error affecting a constitutional right." As explained above, the "[a]pplication of RAP 2.5(a)(3) depends on the answers to two questions: '(1) Has the party claiming error shown the error is truly of constitutional magnitude, and if so, (2) has the party demonstrated that the error is manifest?'" *Grott*, 195 Wn.2d at 267 (quoting *Kalebaugh*, 183 Wn.2d at 583).

An error is "manifest" if an appellant shows actual prejudice. *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009). "To demonstrate actual prejudice, there must be a 'plausible showing by the [appellant] that the asserted error had practical and identifiable consequences in the trial of the case.'" *Id.* (internal quotation marks omitted) (quoting *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007)).

### B. Belander Fails to Demonstrate Manifest Error

Here, the State introduced a redacted portion of the recorded custodial interview at trial. The State omitted the portion of the recording where Belander was given *Miranda* warnings and where he invoked his right to counsel. The recording concluded with the following exchange:

---

[3] Belander filed a statement of additional authority under RAP 10.8 citing *State v. Reuben*, 62 Wn. App. 620, 814 P.2d 1177 (1991), to support this argument. However, in *Reuben*, the appellant contended that certain incriminating statements made by him to a police detective were inadmissible and should have been suppressed. 62 Wn. App. at 621. *Reuben* does not help Belander because, in his briefing, he argued that the State's introduction of his custodial interview amounted to an impermissible comment on his right to remain silent. Because the legal claims are distinct, we do not address *Reuben*.

> [Belander:]  Look, I'm not answering hard questions, so.
> [Detective Buettner:]  Okay, that one a hard one?
> [Belander:]  No, it's not a hard one.  It's just like I'm tired of dealing with all this bullsh*t.
> (Recording ends)

RP (Jan. 30, 2020) at 39.  At the end of the recording, the State did not follow up with Detective Schultz concerning Belander's statement that he was "tired of dealing with all this bullsh*t."  RP (Jan. 30, 2020) at 39.  Instead, the State began to question Detective Schultz about Belander's whereabouts based on his cell phone records and camera footage obtained.  Presumably, the State sought to compare Belander's statements in the custodial interview with those records to prove its theory that he was with the Chrysler Voyager at the time of Bodle's death.

Here, even if we assume, without deciding, a constitutional error, Belander does not demonstrate any prejudice; rather, he contends that we must presume that the alleged error was prejudicial.  Because Belander fails to carry his burden to demonstrate actual prejudice from the statement in the custodial interview, there is no manifest constitutional violation.  *O'Hara*, 167 Wn.2d at 99.  Accordingly, we decline to reach this issue raised for the first time on appeal.

III.    PROSECUTORIAL MISCONDUCT

Belander argues that the prosecutor committed prejudicial misconduct because "[they] improperly introduced evidence that [he] invoked his right to silence and his right to counsel during a police interview."  Br. of Appellant at 23.  Belander also argues that the prosecutor made numerous statements during closing argument that improperly maligned defense counsel.  Belander contends that the alleged misconduct requires us to reverse his convictions.  We disagree.

A.      Legal Principles

The right to a fair trial in a criminal case is guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution and under article I, section 22 of the Washington

17

Constitution. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703, 286 P.3d 673 (2012). To prevail on a claim of prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). The prosecutor's conduct is viewed in "'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.'" *State v. Monday*, 171 Wn.2d 667, 675, 257 P.3d 551 (2011) (internal quotation marks omitted) (quoting *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)).

First, we determine whether the prosecutor's conduct was improper. *Emery*, 174 Wn.2d at 759. If the prosecutor's conduct was improper, then the question turns to whether the prosecutor's improper conduct resulted in prejudice. *Id*. at 760. To establish prejudice, the defendant must show a substantial likelihood that the prosecutor's misconduct affected the verdict. *Id*.

Because Belander did not object to any of the prosecutor's arguments that he now alleges are improper, he "is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Id*. at 760-61. Under this heightened standard of review, the defendant must show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id*. at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)). The focus is on whether the resulting prejudice could have been cured. *Id*. at 762.

B.      Right to Remain Silent

Belander appears to argue that prosecutor's conduct was improper because they introduced the custodial interview at trial, which he contends amounts to impermissible comment by the prosecutor on his right to silence. We disagree.

18

Both the United States and Washington constitutions "guarantee a defendant the right to be free from self-incrimination, including the right to silence." *State v. Pinson*, 183 Wn. App. 411, 417, 333 P.3d 528 (2014). Our Supreme Court has distinguished between a "comment" on the constitutional right to remain silent and a "mere reference" to silence. *See State v. Burke*, 163 Wn.2d 204, 216, 181 P.3d 1 (2008). "A comment on an accused's silence occurs when used to the State's advantage either as substantive evidence of guilt or to suggest to the jury that the silence was an admission of guilt." *State v. Lewis*, 130 Wn.2d 700, 707, 927 P.2d 235 (1996). Such a comment violates the United States and Washington constitutions. *Burke*, 163 Wn.2d at 217. However, a "mere reference" is a statement that only indirectly refers to a defendant's silence. *See State v. Pottorff*, 138 Wn. App. 343, 347, 156 P.3d 955 (2007); *see also Burke*, 163 Wn.2d at 216. Such a statement will not be considered a comment on the right to remain silent if it was "'so subtle and so brief'" that it did not necessarily emphasize the defendant's silence. *Burke*, 163 Wn.2d at 216 (quoting *State v. Crane*, 116 Wn.2d 315, 331, 804 P.2d 10 (1991)).

Here, as explained above, the State played a portion of the custodial interview for the jury. Though the recording concluded with Belander stating, "I'm tired of dealing with all this bullsh*t," RP (Jan. 30, 2020) at 39, the prosecution did not use that statement to its advantage, either as substantive evidence of guilt or to suggest to the jury that the resulting silence was an admission of guilt. *Lewis*, 130 Wn.2d at 707. Rather, the prosecutor began to question Detective Schultz about Belander's whereabouts based on his cell phone records and camera footage.[4] Therefore, the introduction of the custodial interview may be a mere reference to Belander's right to silence,

---

[4] To this end, Belander's reliance on *State v. Hawkins*, 14 Wn. App. 2d 182, 469 P.3d 1179 (2020), is misguided. That case involved a prosecutor committing prejudicial misconduct by eliciting opinion testimony from police witnesses concerning another witness's veracity. *Id*. at 187. That is not the case here.

19

but it is not a comment. Because there is no improper comment on Belander's right to silence, the prosecutor's conduct in introducing the custodial interview was not improper. *See Emery*, 174 Wn.2d at 759. Accordingly, Belander's challenge fails.

C.      Impugning Defense Counsel

Next, Belander contends that the prosecutor committed reversible misconduct by repeatedly impugning defense counsel's integrity during closing arguments. We hold that Belander waived this challenge.

A prosecutor may argue that the evidence does not support the defense's theory. *State v. Lindsay*, 180 Wn.2d 423, 431, 326 P.3d 125 (2014). However, "[i]t is improper for the prosecutor to disparagingly comment on defense counsel's role or impugn the defense lawyer's integrity." *Thorgerson*, 172 Wn.2d at 451. "Prosecutorial statements that malign defense counsel can severely damage an accused's opportunity to present his or her case and are therefore impermissible." *Lindsay*, 180 Wn.2d at 432.

In *Lindsay*, our Supreme Court concluded that, among the numerous rude and self-serving exchanges between counsel that permeated the record, one statement by the prosecutor impugned defense counsel: "This is a crock. What you've been pitched for the last four hours is a crock." *Id*. at 433. The court reasoned that describing defense counsel's argument as a "crock" impugned defense counsel's integrity because it implied that defense counsel was deceptive and dishonest. *Id*. at 433-34.

Similarly, in *Thorgerson*, our Supreme Court concluded that the prosecutor impugned defense counsel's integrity by referring to his presentation of the case as "bogus" and involving "sleight of hand." 172 Wn.2d at 451-52. The court reasoned that the prosecutor went beyond the bounds of acceptable behavior in disparaging defense counsel because their comments implied

20

wrongful deception or even dishonesty in the context of a court proceeding. *Id*. at 452. However, despite the prosecutor's improper and ill-intentioned conduct, *Thorgerson* turned on the defendant's failure to object: the court held that "a curative instruction would have alleviated any prejudicial effect of this poorly thought out attack on defense counsel's strategy." *Id*.

Here, Belander contends that the prosecutor repeatedly impugned defense counsel's integrity during closing arguments. But merely showing that the prosecutor maligned defense counsel is not enough in this situation. Even assuming, without deciding, that the prosecutor's statements impugned defense counsel, like *Thorgerson*, Belander fails to show that the prosecutor's alleged misconduct was so flagrant and ill-intentioned that an instruction to disregard the prosecutor's characterization of the defense's theories could not have cured any resulting prejudice.

Belander argues that a curative instruction would have been ineffective because "[t]he misconduct came during the prosecutor's rebuttal argument and thus were the last words heard by the jury before deliberations." Reply Br. of Appellant at 15. On the contrary, the placement of the comments alone is insufficient to amount to incurable prejudice. The alleged misconduct here does not rise to the level of incurable prejudice because the prosecutor's statements were not so egregious and pervasive. Incurable prejudice has been described as that which, in effect, causes a mistrial because nothing short of a new trial can repair the injury caused by the prosecutor's remarks. *Emery*, 174 Wn.2d at 762.

Here, Belander relies on three statements from the prosecutor's rebuttal argument that were said closely in time to support his claim for prosecutorial misconduct. Specifically, Belander relies on the prosecutor's statements when he said that defense counsel was "(1) trying to 'confuse' jurors with 'smoke and mirrors,' (2) 'just trying to mislead [jurors],' and (3) telling jurors to 'look

over here; don't look at the actual evidence.'" Reply Br. of Appellant at 12 (quoting 3 RP at 1473, 1475, 1476). Unlike *Lindsay*, here, there were not multiple, pervasive instances of misconduct throughout the trial; the alleged misconduct occurred only in closing argument. Like *Thorgerson*, even if the prosecutor improperly impugned defense counsel, again, an issue which we do not decide, we conclude that a curative instruction would have alleviated any prejudicial effect of the prosecutor's attack on defense counsel's strategy. 172 Wn.2d at 452.

Because Belander cannot show that the alleged misconduct was so flagrant, ill-intentioned, and pervasive that an instruction could not have cured any resulting prejudice, we hold that Belander has waived this argument by failing to object at the time.

## IV. SUFFICIENCY OF THE EVIDENCE

Belander contends that the State presented insufficient evidence to prove that Bodle's death occurred in the course of, in furtherance of, or in immediate flight from arson in the second degree to sustain his conviction for murder in the first degree, as charged in count II. We agree.

### A. Legal Principles

Under both the federal and state constitutions, due process requires that the State prove every element of a crime beyond a reasonable doubt. *State v. Hummel*, 196 Wn. App. 329, 352, 383 P.3d 592 (2016). Thus, "sufficiency of the evidence is a question of constitutional law that we review de novo." *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).

The test for determining sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). In a sufficiency of the evidence claim, the defendant admits the truth of the evidence and the court views the evidence and all reasonable inferences drawn from that evidence in the light most

favorable to the State. *Id*. at 265-66. Credibility determinations are made by the trier of fact and are not subject to review. *Id*. at 266. Circumstantial and direct evidence are equally reliable. *Id*. The remedy when the State presents insufficient evidence is dismissal of the charge with prejudice. *State v. Hickman*, 135 Wn.2d 97, 103, 954 P.2d 900 (1998).

A person is guilty of murder in the first degree when he or she commits the crime of arson in the second degree and "in the course of or in furtherance of such crime or in immediate flight therefrom," causes the death of another person other than one of the participants. RCW 9A.32.030(1)(c). A person is guilty of arson in the second degree if he or she knowingly and maliciously causes a fire which damages any automobile or other motor vehicle. RCW 9A.48.030(1).

"Chronology is important in proving that a murder was committed in the course of a felony." *State v. Irby*, 187 Wn. App. 183, 201, 347 P.3d 1103 (2015). "The State must present evidence that the death was a probable consequence of the felony and must specifically prove that the felony began before the killing." *Id*. In order to establish that a killing occurred in the course of, in furtherance of, or in the immediate flight from a felony,

> 'there must be an intimate connection between the killing and the felony. The killing must be part of the res gestae of the felony, that is, in close proximity in terms of time and distance. *A causal connection must clearly be established between the two. In other words, more than a mere coincidence of time and place is necessary.*'

*State v. Hacheney*, 160 Wn.2d 503, 513, 158 P.3d 1152 (2007) (quoting *State v. Brown*, 132 Wn.2d 529, 608, 940 P.2d 546 (1997)) (emphasis added). "[If] it would require speculation to place the [enumerated felony] before the murder in the chronology of events, we cannot sustain the jury's finding that the murder was 'committed in the course of, in furtherance of, or in immediate flight from [the enumerated felony].'" *Irby*, 187 Wn. App. at 202.

B.      The State Failed to Present Sufficient Evidence of Felony Murder

In this case, there is no evidence that the murder was a probable consequence of the arson to support Belander's conviction for murder in the first degree, as charged in count II. Rather, the evidence at trial established that Bodle was killed via blunt force trauma and died shortly after being placed in a wooded area near the burnt up Chrysler Voyager. The evidence at trial also established that the Chrysler Voyager was intentionally set on fire by a handheld flame to the interior of the vehicle. However, there is no evidence clearly establishing a causal connection between the murder and the arson—rather, the evidence proved, at most, that the acts occurred within the same transaction. *See Hacheney*, 160 Wn.2d at 513.

The State contends that "Belander drove with Bodle to a remote wooded area, *burned the van, killed Bodle*, and dragged the body of [] Bodle into the woods, leaving him for dead. All of this occurred within the span of a few minutes." Br. of Resp't at 38 (emphasis added). We reject the State's presentation of the events because it is not supported by the record. Rather, to accept the State's argument would require speculation to place the arson before the murder in the chronology of events, which we have previously declined to do. *Irby*, 187 Wn. App. at 202.

Next, the State argues that "[w]hen two criminal acts are so closely committed in time or place that they cannot be distinguished from each other, then the one is necessarily committed in the course of the other," thus establishing a causal connection between the arson and murder. Br. of Resp't at 39. We disagree because the State's argument is not supported by precedent. "[I]t has never been the law . . . that it is sufficient merely to show the killing and the felony were part of the same transaction" to support a conviction for felony murder. *Irby*, 187 Wn. App. at 202.

Because there is no evidence that Bodle's death was a probable consequence of arson in the second degree, we hold that Belander's conviction for murder in the first degree as charged in

24

count II was not supported by sufficient evidence. Accordingly, we reverse and vacate Belander's conviction as charged in count II and remand to the trial court to dismiss the charge in count II with prejudice.[5]

V.      INEFFECTIVE ASSISTANCE OF COUNSEL

Belander contends that his trial counsel provided him constitutionally ineffective assistance when he failed to raise an objection to the admissibility of the custodial interview and certain statements made in that recording. Specifically, Belander argues that counsel provided him ineffective assistance by failing to object to the admission of the custodial interview because: it violated the WPA; included an inadmissible comment on the exercise of his right to remain silent; and contained information that Belander was a convicted felon, had served a prison sentence, and used drugs, which are all irrelevant and inadmissible under the rules of evidence. We disagree.

A.      Legal Principles

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantees a defendant the right to effective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011), *cert. denied*, 135 S. Ct. 153 (2014). An ineffective assistance of counsel claim is a mixed question of fact and law that we review de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

To prevail on an ineffective assistance of counsel claim, the defendant must show that (1) counsel's performance was deficient and (2) counsel's deficient performance prejudiced the defense. *Grier*, 171 Wn.2d at 32-33. If the defendant fails to satisfy either prong, the defendant's ineffective assistance of counsel claim fails. *Id*. at 33. When the defendant bases his ineffective

---

[5] Based on the dispositive nature of the issue, we do not address Belander's assignment of error related to double jeopardy.

assistance of counsel claim on defense counsel's failure to object, the defendant must show that the objection would have succeeded. *State v. Gerdts*, 136 Wn. App. 720, 727, 150 P.3d 627 (2007).

Counsel's performance is deficient if it falls below an objective standard of reasonableness. *Grier*, 171 Wn.2d at 33. We engage in a strong presumption that counsel's performance was reasonable. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). A defendant may overcome this presumption by showing that "'there is no conceivable legitimate tactic explaining counsel's performance.'" *Grier*, 171 Wn.2d at 33 (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). "The defendant has the burden to show that defense counsel's performance was deficient based on the trial court record." *State v. Vasquez*, 198 Wn.2d 239, 248, 494 P.3d 424 (2021). "Specifically, 'the defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel.'" *Id*. (quoting *State v. McFarland*, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995)).

To establish prejudice, the defendant must "prove that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." *Kyllo*, 166 Wn.2d at 862.

B.      Defense Counsel's Assistance was not Constitutionally Ineffective

As an initial matter, the record is sufficient for us to determine that defense counsel's performance was not deficient by not objecting to the admission of the custodial interview. *Vasquez*, 198 Wn.2d at 248.

Here, as explained above, RCW 9.73.090(1)(b) expressly authorizes the police to record custodial statements so long as the recording strictly conforms with four statutory requirements. However, both portions of the custodial interview did not "commence with an indication of the time of the beginning thereof" or "terminate with an indication of the time thereof." RCW

9.73.090(1)(b)(ii). Therefore, both recorded portions of Belander's custodial interview violated the WPA. RCW 9.73.090(1)(b)(ii). As result, an objection to the admission of the custodial interview likely would have been sustained. *Gerdts*, 136 Wn. App. at 727.

However, the admission of the custodial interview permitted defense counsel to argue in closing that any guilty conscience Belander had could be explained by the fact that he was involved in a separate criminal matter in Yamhill County—not about Bodle's death. Therefore, defense counsel's failure to object to the admission of the custodial interview does not constitute deficient performance because there is a conceivable, legitimate trial tactic explaining counsel's decision. *See Grier*, 171 Wn.2d at 33. Accordingly, Belander fails to show that defense counsel was deficient in failing to object to the admission of the custodial interview.

As to Belander's remaining arguments, even if defense counsel was deficient for failing to object to certain statements made by him in the custodial interview, Belander fails to establish prejudice. There is an overwhelming amount of untainted evidence that supports the jury's finding of guilt even in the absence of the recorded custodial interview.

The evidence at trial showed that in January 2019, Belander borrowed Lewis's red or maroon 2002 Chrysler Voyager. Lewis stated that was "pretty common to have jugs of water in the car" because the van was known to overheat. 2 RP at 589. Teafatiller stated that Belander arrived at her apartment in a red minivan when he came to pick up Bodle and that he asked her to fill up water jugs for the van because it was having an overheating problem. Therefore, this was the same van that Belander showed up in to pick up Bodle. Shortly thereafter, Belander gave Bodle a ride to Portland to purchase heroin. This point is corroborated by Belander's cell phone records which show him travelling from Mount Angel at about 3:00 a.m. to areas just outside of the Portland metro area at about 6:00 a.m.

There is circumstantial evidence that Belander was with Lewis's 2002 Chrysler Voyager at the time Bodle was killed. Specifically, Belander's cell phone records show him in the Washougal and Vancouver areas from 3:32 p.m. to 7:05 p.m. There was no cell phone activity from about 7:00 p.m. to 11:00 p.m., but there was surveillance footage of Lewis's Chrysler Voyager going towards the crime scene with a dark sedan following it during that time. That dark sedan then passed the Swift Dam cameras again roughly 20 minutes later, heading back toward Woodland. Detective Schultz testified that the timing indicated on Belander's phone records and the surveillance footage was consistent with how long it would take to travel to and from Forest Road 83, where the burnt van and Bodle's body was found, from the Vancouver area.

There is also other overwhelming circumstantial evidence implicating Belander's involvement in Bodle's murder. Specifically, the evidence at trial showed that Belander was not primarily known as a heroin dealer. And prior to January 23, 2019, Belander had not messaged anybody about heroin. However, Belander informed at least 10 people that he had heroin for sale in the late hours of January 23, after Bodle presumably purchased it and died. Additionally, as soon as Belander's cell phone pinged off a cell tower for the first time in about four hours (since 7:00 p.m.), he began messaging friends about needing help and fresh clothes because his were "wet and bloody." 3 RP at 1061. Belander even gave his friends conflicting stories as to what make the van was or what happened to the van. Belander also expressed guilt by telling his friends that he needed to leave the state, that he might be going to prison for the rest of his life, and that he ruined his life and it was all his fault. Furthermore, Belander's DNA was found at the crime scene, but most importantly, on the scrunched up portion of the jacket that Bodle was wearing at the time of his death.

Because there is an overwhelming amount of untainted evidence that supports the jury's finding of guilt, the result of the proceeding would not have been different even if the custodial interview was excluded. *See Kyllo*, 166 Wn.2d at 862. Accordingly, we hold that Belander's ineffective assistance of counsel claim fails.

VI.     COMMUNITY CUSTODY SUPERVISION FEES

Belander argues that the trial court erred by imposing community custody supervision fees after finding him indigent. We remand the matter for the trial court to reconsider imposing the community custody supervision fees.

Before imposing costs and fees, RCW 10.01.160(3) requires a superior court to conduct, on the record, an individualized inquiry into a defendant's ability to pay. *State v. Ramirez*, 191 Wn.2d 732, 745-46, 426 P.3d 714 (2018). RCW 10.01.160(3) states in relevant part, "The court shall not order a defendant to pay costs if the defendant at the time of sentencing is indigent as defined in RCW 10.101.010(3) (a) through (c)."

RCW 9.94A.703(2)(d) governs community custody supervision fees and states, "(2) **Waivable conditions.** Unless waived by the court, as part of any term of community custody, the court shall order an offender to: . . . (d) Pay supervision fees as determined by the department." Because they are waivable by the court, community custody supervision fees are discretionary LFOs. *State v. Spaulding*, 15 Wn. App. 2d 526, 536, 476 P.3d 205 (2020).

We have held that the community custody supervision fee is not a 'cost' under RCW 10.01.160(3), reasoning that

> RCW 10.01.160(2) defines "cost" as an expense specially incurred by the State to prosecute the defendant, to administer a deferred prosecution program, or to administer pretrial supervision. The supervision fee is not a "cost" under this definition. Therefore, RCW 10.01.160(3) does not prohibit the imposition of supervision costs on an indigent defendant.

*Id*. at 536-37. However, when the record is unclear as to whether the trial court actually intended to impose a community custody supervision fee, remand is appropriate. *Id*. at 537.

Belander contends that the trial court erred in imposing the community custody supervision fee because it is a discretionary cost and he is indigent. Based on this contention, Belander also asks us to overturn *State v. Starr*, 16 Wn. App. 2d 106, 479 P.3d 1209 (2021). But as explained above, the community custody supervision fee is not a discretionary cost within the meaning of RCW 10.01.160(2). The *Spaulding* and *Starr* courts were correct on this point. Accordingly, we decline Belander's request to overturn *Starr* and hold that his argument fails.

Here, the record is silent as to whether the trial court exercised any discretion in determining whether to impose or waive the community custody supervision fee, and neither party addressed this fee in their arguments at sentencing. Therefore, we remand the matter for the trial court to reconsider imposing the community custody supervision fees.

## CONCLUSION

We affirm Belander's conviction for murder in the first degree as charged in count I, and for arson in the second degree as charged in count V. However, we reverse Belander's conviction for murder in the first degree as charged in count II because the State failed to present sufficient evidence and remand to the trial court to dismiss the charge in count II with prejudice. Furthermore, we also remand for the trial court to reconsider imposing the community custody supervision fees.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, J.

We concur:

Lee, P.J.

Ashcraft, J.P.T.*

---

* Judge Ashcraft is now serving as a judge pro tempore of the court pursuant to RCW 2.06.150.